**Opinion filed September 6, 2012**



In The

# Eleventh Court of Appeals

_____

## No. 11-10-00337-CR

_____

## JOE SHAWN HOLLANDER, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 91st District Court**
**Eastland County, Texas**
**Trial Court Cause No. 22324**

## O P I N I O N

The jury convicted Joe Shawn Hollander, appellant, of criminal mischief—diversion of a public service (electricity) in an amount less than $20,000—a state jail felony. TEX. PENAL CODE ANN. § 28.03(a)(2), (b)(4)(D) (West 2011). The jury found the two enhancement paragraphs that alleged prior felony convictions to be true and assessed punishment at confinement for ten years and a fine of $1,000. We affirm.

The indictment alleged that appellant intentionally and knowingly tampered with tangible property, an electric meter, and caused pecuniary loss of less than $20,000 to the owner. Section 28.03(a)(2), (b)(4)(D). Because there was no direct evidence as to who tampered with the electric meter, the State relied on the presumption in Section 28.03(c) as proof that appellant was

the person responsible for tampering with the electric meter. *Id.* § 28.03(c). Under Section 28.03(c), it is presumed that a person who is receiving the economic benefit of a power supply has knowingly tampered with the meter.

The State had the burden of proving beyond a reasonable doubt that appellant was the person who tampered with the electric meter and diverted the electricity. In five issues, appellant contends that the State failed to meet that burden or that the trial court erred in its charge and appellant was harmed.

*Texas Penal Code Sections 28.03 and 2.05*

Section 28.03(a)(2) provides that a person commits an offense if, without the effective consent of the owner, he intentionally or knowingly tampers with the tangible property of the owner and causes pecuniary loss to the owner. Section 28.03(b)(4)(D) provides that the offense is a state jail felony if the amount of pecuniary loss is less than $20,000 and the actor causes to be diverted wholly, partly, or in any manner, including installation or removal of any device for any such purpose, any power supply.

Section 28.03(c) provides that, for purposes of Section 28.03, it shall be presumed that a person who is receiving the economic benefit of a power supply has knowingly tampered with the tangible property of the owner (e.g., the electric company) if the supply has been (1) diverted from passing through a metering device, (2) prevented from being correctly registered by a metering device, or (3) activated by any device installed to obtain the power supply without a metering device.

TEX. PENAL CODE ANN. § 2.05(a) (West 2011) provides that, when the Texas Penal Code "establishes a presumption with respect to any fact, it has the following consequences:"

> (1) if there is sufficient evidence of the facts that give rise to the presumption, the issue of the existence of the presumed fact must be submitted to the jury, unless the court is satisfied that the evidence as a whole clearly precludes a finding beyond a reasonable doubt of the presumed fact; and

> (2) if the existence of the presumed fact is submitted to the jury, the court shall charge the jury, in terms of the presumption and the specific element to which it applies, as follows:

>> (A) that the facts giving rise to the presumption must be proven beyond a reasonable doubt;

2

(B) that if such facts are proven beyond a reasonable doubt the jury may find that the element of the offense sought to be presumed exists, but it is not bound to so find;

(C) that even though the jury may find the existence of such element, the state must prove beyond a reasonable doubt each of the other elements of the offense charged; and

(D) if the jury has a reasonable doubt as to the existence of a fact or facts giving rise to the presumption, the presumption fails and the jury shall not consider the presumption for any purpose.

*The Testimony at Trial*

The State presented only two witnesses: Russ Greene with American Electric Power in Cisco and Officer Scott McDade with the Cisco Police Department. Greene is a line service technician who turned off the electricity at 300 West 6th Street in Cisco in late February 2010. After turning the electricity off, he put the meter box back on and put a seal on the box to deter any tampering. On March 4, 2010, Greene noted that the seal had been removed and the meter had been turned back on. He removed the meter, put a plastic cover over it, and closed the account. Again, he put an American Electric Power seal on the box cover.

On April 26, 2010, Greene was working next door and noticed that there were lights on at 300 West 6th Street. The back door to the house was open, and Greene observed that the seal was broken off the meter box. He observed wires "jumpering" out to the meter box. Greene cut the electric line to the pole in the alley to prevent any further diversion of electricity to the house. Greene testified that he never saw anyone at the location and that he contacted the Cisco Police Department on April 26.

Officer McDade went with Greene to the house where Officer McDade took pictures of the tampered meter box. Greene testified that he never saw anyone at the house and that he had no personal knowledge concerning the person who might have tampered with the meter. He also testified that the electric account at 300 West 6th Street was in the name of John Coslett.

Officer McDade identified the pictures of the tampered meter box. He testified that he knew appellant and had been in contact with him on several occasions. On April 25, 2010, he had taken appellant into custody and issued appellant a Class C citation. Appellant's residence on that citation was listed as 300 West 6th Street. Officer McDade testified that he also believed that address to be appellant's residence; he had seen appellant going to and coming from the

3

residence. Appellant's arrest on April 25 had no relation to the offense that is the subject of this case. The State asked about the arrest only to show that the residence of appellant was 300 West 6th Street.

During cross-examination, Officer McDade testified that he had never questioned the neighbors to see if they had observed anyone tampering with the meter box; that he could not state with certainty that he had seen appellant at the address from the end of February to April 26, 2010; and that he had seen other people at the house during that time. He recognized Jeana Tafelmeyer as one who was there during that period, but he was not certain whether the other people lived at the house. Officer McDade agreed that any of the other people could have tampered with the meter. After Officer McDade's testimony, the State rested.

Appellant called four witnesses to testify in his defense: Tifnie Yeshea Ann Boone, his girlfriend; Coeta Jeanette Sobley and her mother, Teresa Lynn Krebs; and Thomas Ray Hollander, appellant's uncle.

Boone testified that she was appellant's girlfriend and that she currently lived in Fort Worth. Boone testified that she started staying with appellant at 300 West 6th Street in the middle of February 2010 and that she was there when the electricity was turned off. She stayed there from mid-February to mid-March. However, she and appellant would also stay at her trailer house at 400 East 14th Street in Cisco. According to Boone, the house at 300 West 6th Street had no electricity at any time that she was there. They used candles and flashlights. She added that her trailer house also had no electricity.

Boone said that she and appellant stayed at her trailer house at times for privacy because there were a lot of people living at 300 West 6th Street. She named at least ten of them and said that they were people who needed a place to stay. She testified that a number of the people were unwanted guests and that appellant kicked them out but that they often returned to live there. During cross-examination, Boone acknowledged that the other people who stayed at the residence were doing drugs; she had seen marihuana pipes. Boone testified that she did not believe that the house belonged to appellant because the house was not in his name. After she moved out in March, she continued to visit with appellant almost every day. According to Boone, appellant was then staying with Scott Nicks in Eastland.

Coeta Jeanette Sobley testified that she was a friend of appellant and that she resided in Eastland. Sobley testified that appellant stayed with her in Eastland four or five days during

4

February and then began staying with her for a much longer period around the end of March. Between the end of February and the end of March, Sobley went to appellant's house in Cisco to take him to buy groceries and to check on him. There were other people in the house living on the first floor; she recognized Sheila Pattenaude King and Ashley Williams. On one occasion during the first week in March, she went there and the people downstairs told her that appellant was "in the black room" upstairs. Sobley testified that there was no water in the house and no lights; they were using candles for light. Sobley testified that appellant stayed with her from March 22 through March 28 and that he then went to stay with another friend in Olden, Scott Nicks.

Apparently, appellant relied on other people for rides; he called Nicks to pick him up at Sobley's house. Sobley said that she would go to Nicks's house in response to appellant's telephone calls; however, appellant would wait for her at the end of the driveway. Sobley said that Nicks told her that she was not allowed to come into his house.

Sobley testified that, when she went to see appellant in mid-April, there was an extension cord from the neighbor's house to appellant's house so appellant could see what he was doing. She thought appellant had permission to use the neighbor's electricity.

According to Sobley, appellant stayed at her house or at Nicks's house after appellant's girlfriend went to jail in April. During cross-examination, the State advised Sobley that Boone was incarcerated on March 17, and Sobley acknowledged that it was after March 17 that appellant began staying with her or Nicks. At a later point in her testimony, she admitted that she might have been confused about the dates to which she had previously testified.

Teresa Lynn Krebs, Sobley's mother, also lived in Eastland. She testified that appellant began staying with Sobley in mid-March and that she saw him there on a number of occasions. Krebs also said that appellant was there in mid-April at different times. She guessed that appellant stayed at Sobley's house off and on for four months through June.

Thomas Ray Hollander lives in Cisco. Thomas's brother, Leonard, is deceased; appellant is Leonard's son. The house at 300 West 6th Street belonged to Leonard, who had four children. Thomas has paid the taxes on the house. He did not think that appellant owned the house. After Leonard's death, Thomas had allowed Leonard's children to live there. None of the children paid rent. He said that Stephen Coslett, a stepson, and Sheila Hollander, Leonard's daughter, had lived there. He also identified John Coslett as another stepson who lived at 300 West 6th Street

5

prior to appellant; the utilities were in the name of John Coslett. Thomas did not believe that any of the other children were living there when appellant moved into the house; however, he was not certain when appellant moved in. He did recall that appellant called him to tell him that appellant had moved out; however, he did not remember the date of the call.

Thomas remembered going by the house and encountering two men who were staying there. They said that they had permission to be there. When Thomas returned, the men were gone. Thomas thought that the men were there before appellant called Thomas to say that he was moving out. Thomas testified that he never saw any lights on when he went by the house and that he did not know when the utilities were cut off.

Thomas did state that, when appellant called him about moving out, appellant asked Thomas to lock the place. Thomas said that he purchased a deadbolt lock to lock the front door and that he looked around. Thomas stated that no one else was at the house at that time. Thomas testified that he changed the locks near the end of May and picked up the mail at the house then. There was a letter to appellant in the mail that Thomas picked up.

The State called Officer McDade to testify in rebuttal. Officer McDade testified that, on April 25, 2010, he contacted appellant in the 1400 block of Conrad Hilton in Cisco.

*Analysis*

In appellant's first two issues, he contends that the evidence was insufficient to link him to the diversion of electrical power and insufficient to support the statutory presumption in Section 28.03(c).

We review a sufficiency of the evidence issue, regardless of whether denominated as a legal or a factual sufficiency claim, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); and *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

The jury, as the trier of fact, was the sole judge of the weight and credibility of the evidence. TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007), art. 38.04 (West 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008). We must presume that the jury

6

resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The standard is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Clayton*, 235 S.W.3d at 778.

There was no direct evidence to establish that appellant tampered with the electric company's meter; therefore, the State had to rely on circumstantial evidence and the presumption found in Section 28.03(c). Evidence supporting the fact that 300 West 6th Street was appellant's residence included the citation that Officer McDade issued to him on April 25. Apparently, appellant gave Officer McDade his address; Officer McDade testified that he believed 300 West 6th Street to be appellant's residence based on seeing appellant there. Boone testified that she and appellant were at the residence from mid-February until mid-March, although they also stayed at her trailer house in Cisco on occasion. Boone also testified that appellant had invited some of the other people to stay there but that there were a number of people that he did not invite. Appellant kicked some of the people out from time to time, although they often came back to stay at the house. Thus, appellant exercised control over the house. Boone's testimony that they were at the house until mid-March supports an inference that they were there when Greene discovered the tampered meter box on March 4.

Sobley testified that she went to the house to see appellant during the first week in March, an indication that appellant was there when the meter box was tampered with. Sobley saw the extension cord that appellant plugged into an outlet at his neighbor's house to enable appellant to see at his house. Unfortunately, there was no evidence from the electric company as to when its records reflected that power was being diverted to the house. The only evidence was Greene's testimony that he found a tampered meter box on March 4 and again on April 26.

Thomas testified that appellant lived at the house and called Thomas when he moved out. During the telephone call, appellant asked Thomas to lock the house. Thomas locked the house and did not see anyone else living there. However, Thomas had no idea when he first locked the house. We have only Greene's testimony that, on April 26, he found the meter box had been tampered with again. And, we have Officer McDade's testimony that he arrested appellant for an unrelated charge at another location in Cisco on April 25. Because appellant relied on others for transportation, it is a reasonable inference that appellant was staying at his house on April 25 and receiving the benefit of the diverted electricity.

7

After examining all of the evidence in the light most favorable to the verdict, we find that a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Isassi*, 330 S.W.3d at 638. There was sufficient evidence of the facts—that appellant was in control and management of the house and was present at the house during periods when electricity was diverted to the house—to give rise to the presumption that he received the economic benefit of the diverted electricity. Boone testified that she was with appellant at the house until mid-March. Sobley placed appellant at his house during the first week in March. And, appellant was walking around in Cisco on April 25. Appellant's first issue is overruled.

In appellant's second issue, he contends that, even if the statutory presumption applies, the evidence created by the statutory presumption is insufficient to support his conviction. Part of his argument under the first issue also applies to this issue: there were a number of people living in the house, receiving the benefit of diverted electricity, that may have been responsible for the diversion. Appellant cites *Robertson v. State*, 888 S.W.2d 493 (Tex. App.—Amarillo 1994, pet. ref'd), and *Gersh v. State*, 714 S.W.2d 80 (Tex. App.—Dallas 1986), *pet. ref'd*, 738 S.W.2d 287 (Tex. Crim. App. 1987). In both cases, the presumption in Section 28.03(c) at the time applied to a person in whose name the utility was last billed and who received the economic benefit from a tampered meter.

*Robertson* is not helpful. The court in *Robertson* held that the presumption did not arise in that case because the defendant was not the last party to be billed for electrical services at that location. Without the statutory presumption, evidence that the defendant lived at the house and knew electricity was being supplied to the house was insufficient to affirmatively link him to the offense. 888 S.W.2d at 495.

In *Gersh*, there was evidence that a gas meter had been altered to prevent the flow of gas from registering properly and that, when the gas company installed a tamper-proof meter, the meter registered much higher gas usage. 714 S.W.2d at 81. The defendant lived there with his wife and two children. He argued that the presumption contained in the criminal mischief statute, Section 28.03(c), was unconstitutional as applied to him. The court reasoned that the presumption was valid to the extent that it presumed that one who tampers with a meter will receive an economic benefit. *Id.* But, to the extent that the presumption identified the person in whose name the utilities were billed as the one who tampered with the meter, the court was of

the opinion that the presumption ignored common facts of modern living arrangements such as roommates. *Id.* at 81–82. The court pointed out that the economic benefit portion of the statutory presumption identified a class of individuals among whom the likely perpetrator could be found, but the "person billed" element arbitrarily selected an individual within a class or group all equally likely to have accomplished the tampering. The court noted that the wife and the children also shared in the benefits derived from the gas. Because the court found that the "person billed" part was too arbitrary, the court held the presumption unconstitutional as applied to the defendant. *Id.* at 82.

In *Edmondson v. State*, 747 S.W.2d 8 (Tex. App.—El Paso 1988, pet. ref'd), the court distinguished *Gersh* on the basis that only the defendant in *Edmondson* resided at the address where the gas line had been tampered with to provide service without a meter. He was the person billed and only he received the benefits; therefore, the presumption was not unconstitutional as applied to him. 747 S.W.2d at 9.

As opposed to the statutory presumption in *Robertson*, *Gersh*, and *Edmondson*, Section 28.03(c) currently provides that it is presumed that a person receiving the economic benefits of a diverted power supply has knowingly tampered with the meter if the supply has been diverted from passing through the metering device. Appellant argues that the other people staying at the house received the benefits of the diverted electricity. If it is shown who else benefitted, we know of no reason why the presumption would not apply to that person or persons also. Appellant's second issue is overruled.

In appellant's last three issues, he argues that the trial court abused its discretion by charging the jury on the Section 28.03(c) presumption because the State failed to prove that appellant was a person who received the economic benefit of a diverted power supply, because the court failed to instruct the jury that the State had to prove the facts giving rise to the presumption beyond a reasonable doubt as required by Section 2.05(a), and because the court's charge was unconstitutional as applied to appellant and constituted a comment on the weight of the evidence.

In analyzing a complaint of jury charge error, we first determine whether or not there was an error in the charge. *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003). If we find that there was an error, we must then determine if the error caused sufficient harm to warrant reversal. The standard for determining harm depends on whether or not an appellant

properly preserved error in the jury charge. Appellant acknowledges that he did not object to the jury charge at trial; therefore, his complaints concerning the statutory presumption in Section 28.03(c) and the lack of Section 2.05(a) instructions must be shown to have caused him to suffer egregious harm. *Ex parte Smith*, 185 S.W.3d 455 (Tex. Crim. App. 2006). Errors that result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory. *Ngo v. State*, 175 S.W.3d 738, 750 (Tex. Crim. App. 2005). We must review the entire jury charge, the evidence, the arguments of counsel, and any other relevant information in order to determine whether the error was so egregious that appellant was denied a fair and impartial trial. TEX. CODE CRIM. PROC. ANN. art. 36.19 (West 2006); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).

In appellant's third issue, he argues that the trial court erred in stating the presumption in its jury charge. As discussed earlier, we found that there was sufficient evidence for a rational finder of fact to find that appellant resided in and was in control of the house and received the benefit of the diverted electricity. As opposed to the ground for acquittal in *Davis v. State*, 658 S.W.2d 572 (Tex. Crim. App. 1983),[1] cited by appellant, the evidence in this case was sufficient to invoke the presumption. Therefore, the trial court did not err in charging the jury on the statutory presumption. Appellant's third issue is overruled.

In appellant's fourth issue, he argues that the trial court erred because it failed to instruct the jury that the State had to prove the facts giving rise to the presumption beyond a reasonable doubt. The State concedes that the trial court erred in failing to charge the jury as required by Section 2.05(a). Without the required instructions in Section 2.05(a), the presumption in Section 28.03 is an unconstitutional, mandatory presumption. *See Willis v. State*, 790 S.W.2d 307, 309–10 (Tex. Crim. App. 1990); *Webber v. State*, 29 S.W.3d 226, 230 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). Mandatory presumptions are unconstitutional because they relieve the State of the burden of proving every element of the offense beyond a reasonable doubt. *Garrett v. State*, 220 S.W.3d 926, 930 (Tex. Crim. App. 2007). Because appellant did not object at trial to this error in the court's charge, we cannot reverse the conviction absent a finding that the error caused appellant to suffer egregious harm. *Bellamy v. State*, 742 S.W.2d 677, 685 (Tex. Crim. App. 1987); *Almanza*, 686 S.W.2d at 171–72.

---

[1]*See Green v. State*, 893 S.W.2d 536, 538 (Tex. Crim. App. 1995), for a discussion of *Gersh* and *Davis*.

10

The jury charge contained the presumption on the first page. The jury charge instructed the jury that "[a]ll persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt." The charge also instructed the jury that "[t]he law does not require a defendant to prove his innocence or produce any evidence at all." And the application paragraph included an instruction that the jury had to find "that the [defendant] did then and there, intentionally or knowingly tamper with tangible property." Alone, the general instructions did not remedy the error in the charge. *See State v. Lewis*, 151 S.W.3d 213, 223 (Tex. App.—Tyler 2004, pet. ref'd). But, the State discussed the presumption (and the facts to support it) during voir dire and during closing argument.

The State began closing argument with a discussion of the presumption:

[W]hat makes this case so unique, as I told you during voir dire, is that for this offense, unlike hundreds of others, there is a presumption besides a presumption of innocence. And, that is, by law there is a presumption that if you're receiving the economic benefit, then you knowingly cause the damage to the power supply. Now, economic benefit? I would say getting electricity without paying for it is an economic benefit.

The State then reminded the jury that it had the burden of proof and promised to review the facts that supported the presumption. In his closing argument, appellant acknowledged that someone tampered with the electric meter, but argued that the evidence was insufficient to show that he received the benefit of the diverted electricity. In finishing its closing argument, the State emphasized the testimony that supported the application of the presumption to appellant.

Courts of appeals have held that, where the great weight of the evidence supports the facts giving rise to the presumption, egregious harm has not occurred. *See Tottenham v. State*, 285 S.W.3d 19, 29–32 (Tex. App.—Houston [1st Dist.] 2009, no pet.); *Neely v. State*, 193 S.W.3d 685, 688 (Tex. App.—Waco 2006, no pet.); *Lewis*, 151 S.W.3d at 224; *Webber*, 29 S.W.3d at 237. We have previously reviewed the evidence that supports the facts giving rise to the presumption: appellant was in control and management of the house as his residence and appellant benefitted from the tampered electric meter. We cannot say that appellant suffered egregious harm because the trial court failed to specifically instruct the jury as required by Section 2.05(a). Appellant's fourth issue is overruled.

In appellant's final issue, he argues that the trial court erred in charging the jury on the statutory presumption because the court's charge was unconstitutional as applied to appellant and because the inclusion of the presumption constituted a comment on the weight of the evidence. Appellant has provided no rationale or authority to support these two contentions. TEX. R. APP. P. 38. Appellant's fifth issue is overruled.

*This Court's Ruling*

The judgment of the trial court is affirmed.


TERRY McCALL

JUSTICE


September 6, 2012

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel[2] consists of: Wright, C.J.,
McCall, J., and Hill.[3]

---

[2]Eric Kalenak, Justice, resigned effective September 3, 2012. The justice position is vacant pending appointment of a successor by the governor or until the next general election.

[3]John G. Hill, Former Chief Justice, Court of Appeals, 2nd District of Texas at Fort Worth, sitting by assignment.